FRANK H. GIBSON, INC., A CORPORATION, APPELLANT AND CROSS-APPELLEE, V. OMAHA COFFEE COMPANY, A CORPORATION, ET AL., APPELLEES AND CROSS-APPELLANTS.
133 N. W. 2d 462

Filed February 26, 1965. No. 35793.

Pilcher, Howard & Hickman, for appellant.

Fraser, Stryker, Marshall & Veach, for appellees.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, and BROWER, JJ., and POLLOCK and SIDNER, District Judges.

SIDNER, District Judge.

Plaintiff Frank H. Gibson, Inc., is a corporation, which for many years had been engaged in selling tea and coffee to institutions in the Omaha area. The principal stockholder and president was Edgar J. Bellows. The defendant Kenneth Loseke was the owner of a small interest of stock in the company, and was the nominal secretary, although the record shows that he had no part in determining company policy. Loseke was in charge of a force of four salesmen who sold and delivered the coffee to the institutions. Plaintiff company in its sale to its various customers generally furnished the coffee-making equipment. Plaintiff company was engaged in a highly competitive business, and during 4 of the last 5 years had either shown no profit, or had lost money in its operations. The president, Edgar J. Bellows, was 74 years of age. He was desirous of selling the business of the plaintiff company and proceeded to negotiate the sale thereof through his accountant Rosenblum.

Rosenblum contacted two principal companies that might be interested in the purchase of the business. The first was the defendant E. C. Conroy Coffee Company of Kansas City, Missouri. Conroy was principally a supplier of coffee, and during the last 2 years was the sole supplier of coffee to the plaintiff company, with an annual gross business to plaintiff in the amount of $150,000. The second company contacted was the Continental Coffee Company of Chicago, which was a large dealer in institutional coffee on a nationwide basis, and which also had institutional coffee routes in Omaha.

After the original negotiations had been entered into by Rosenblum, both Conroy and Continental investigated the operations of plaintiff company, and both came to the conclusion that before the good will value of the business could be established, it would be necessary to determine whether or not Loseke would remain with the purchaser of the assets of the corporation. Also, all parties agreed that whatever Loseke did, the salesmen working under him would probably also do.

Conroy, in order to determine the bid it would make, contacted Loseke and the other employees. They secured from Loseke, with the consent of Bellows, a list of all the equipment owned, and its location, so that they might value it. It becomes evident from later evidence that they probably had assurance from Loseke and the other employees that if Conroy purchased the assets, they would go to work for the Conroy Company, and that Conroy would hire the whole group. Furthermore, if the business was sold to Continental the employees would not work for it if Conroy offered them jobs. In these negotiations, Conroy was represented by its officers, Ralph Clark and David Clark. There is no question here but that their acts were those of the Conroy Coffee Company.

The defendant Omaha Coffee Company was a corporation in the process of organization, set up by the Conroy Company through the Clarks, and the dealings between any of these parties are legally attributable to the Conroy Company so far as this opinion is concerned.

At no time while employed by plaintiff did Loseke or other employees have a contract of employment. Continental offered Loseke a favorable contract of employment as far as pay was concerned. It did, however, have a clause forbidding him for 1 year to participate in the only kind of work he knew if he ever left Continental's employment.

No firm contract of employment was ever offered any of the other employees by Continental.

On September 21, 1962, representatives of Conroy, having prepared an offer of purchase, met with Bellows and his attorney Pilcher in Pilcher's office. A proposed contract of sale of the business had been prepared. Bellows stated that the offer was far too low, and demanded much more. A Conroy Company representative then replied in substance that it was going to stay in Omaha, and that by Monday morning it would have plaintiff's employees working for it even if plaintiff did not sell the business to Conroy. Bellows then made the statement that he would sue and enjoin every party engaged in any such enterprise, whereupon the meeting broke up.

Subsequent to this date, negotiations were again opened up between Conroy and plaintiff, and were also continued with Continental. Pending the negotiations for sale, Bellows asked his employees to continue to work for plaintiff company until negotiations for sale were completed, and they did so continue work until the business was sold.

On September 27, 1962, plaintiff company had a meeting, at which Loseke was present, and Bellows was authorized to make the sale of the business to whom, and on whatever terms, he pleased in order to liquidate the corporation. On September 28, sale of plaintiff company was completed to Continental Coffee Company, under the terms of which it took over the business on Monday, October 1. The date of sale, September 28, was on Friday and the close of the work week for most of the employees. After announcement of the sale, Loseke left and did not return. Two other employees came to work on Saturday morning, but did not return on Monday. A third employee showed up on Monday morning, and on learning of the sale of the company, he left and did not return.

On the morning of Monday, October 1, 1962, the Omaha Coffee Company, a corporation, which had been formed prior to the meeting of September 21, opened for business. Its employees were the former employees of

plaintiff company. On that date they called on various customers and continued to do so until the date of trial. During this time they had retained for Omaha Coffee Company a very high percentage of the customers who were formerly those of the plaintiff company.

This action was instituted, in which it was alleged that plaintiff suffered damages as a result of decrease in the amount realized in the sale of the business because of conspiracy entered into betwen Conroy, Loseke, and the other employees. Before trial the other employees were dismissed from the lawsuit. In the petition plaintiff alleged, among other things, the existence of fraud in the sale of coffee to its former customers by the salesmen after they went to work for Omaha Coffee. The case was submitted to the jury, and it returned a verdict for the plaintiff. On a motion for new trial defendants set forth various errors in trial and instructions and in failing to sustain defendants' motion to dismiss at conclusion of evidence. The court set aside the verdict and granted a new trial. It is from this order that the plaintiff appeals; and the defendants cross-appeal from a denial of their motion for a dismissal.

In the case of Reid v. Brechet, 117 Neb. 411, 220 N. W. 590, it is stated that: " 'Civil conspiracy' is a combination of two or more persons to accomplish, by concerted action, an unlawful or oppressive object, or lawful object by unlawful or oppressive means."

In the light of this legal proposition we review the evidence, first as to whether there was an unlawful or oppressive object. The evidence as to the allegation of the petition as to fraud in dealing with customers after the employees went to work for the Omaha Coffee Company is not substantiated by any evidence found in the record. With regard to the so-called other illegal acts of taking the customer lists, there was no evidence from which this could be held to be an illegal act, for the reason that this information was furnished to the Conroy Company by the plaintiff, with the consent of plain-

tiff's president, so that the assets could be valued. This, therefore, eliminates any evidence as to illegal acts to be submitted to the jury.

The next question is whether the concerted action involved here was made in bad faith, with malice, or with evil intent, as these various terms are used in different cases. In this instance, it must be remembered that plaintiff itself, by negotiating for the sale of the properties, instituted the whole chain of events which led up to the actions taken by the various parties. The evidence shows that Conroy had a valuable business in the Omaha trade territory and had equally as much right to try to protect it as did the plaintiff to protect its business. As stated in Restatement, Torts, § 708, p. 519: "One who causes loss of business or occupation to another merely by engaging in a business or occupation in good faith is not liable to the other for the loss so caused, though he knows that the loss will result."

This same thought is stated in the case of Hompes v. B. F. Goodrich Co., 137 Neb. 84, 288 N. W. 367, as follows: "A person may do business with whomsoever he desires. He may likewise refuse business relations with any person whomsoever, whether the refusal is based on reason, whim, or prejudice."

Defendant Conroy Coffee Company had ample reason, and in the interest of good business, to take the action that it took in order to protect its business which would be lost to a competitor.

The defendant Loseke and other employees, having no contract of employment, could individually, without question, bargain for a contract of employment with whom they chose. This they could also do in concert with each other without it being illegal or for a wrongful purpose. The defendant Loseke had good reason to take action to secure his employment with whom he chose, inasmuch as the company for which he was an employee, and an officer, was going out of business. He had every reason to take what seemed to him to be the

best employment that he could. Furthermore, neither he nor any fellow-employees left the plaintiff company as long as it remained in business.

Therefore, this leaves no evidence in the record of any malice, evil intent, or lack of good faith by any of defendants. While it is ordinarily a fact question to be determined by the jury as to whether these elements exist in the absence of evidence to substantiate these elements, the court should have made the determination.

Finding no evidence of any illegal act or any legal act done by unlawful or oppressive means, the judgment is reversed and the cause remanded with directions to enter a dismissal of the action on defendants' cross-appeal.

In the light of this conclusion, it becomes unnecessary to discuss any of the questions raised by plaintiff as to the error of setting aside the verdict and ordering a new trial, and its appeal is dismissed.

REVERSED AND REMANDED WITH DIRECTIONS.